**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

---

QAWI NUR a/k/a DARRIUS JAMES,

      Petitioner,

v.

GEORGIA CROWELL,

      Respondent.

)
)
)
)
)
)
)

No. 2:14-cv-02684-TLP-tmp

---

**ORDER TO UPDATE THE DOCKET WITH CURRENT RESPONDENT,
ORDER DENYING § 2254 PETITION,
ORDER DENYING CERTIFICATE OF APPEALABILITY,
ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH, AND
ORDER DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL**

---

Petitioner Qawi Nur a/k/a Darrius James[1] petitions this Court under 28 U.S.C. § 2254.[2]

(Petition ("Pet."), ECF No. 1.) After reviewing the original petition, United States District Judge

John Fowlkes entered an order directing Petitioner to file an amended petition on the official

form. (Order, ECF No. 6.) Petitioner filed an amended petition. (Amended ("Am.") Pet., ECF

No. 9.) About two weeks later, Judge Fowlkes directed Respondent to file the state court record

and respond to the petition. (Order, ECF No. 10.) Respondent answered the amended petition

and filed the state court record. (Answer, ECF No. 13; Record ("R."), ECF No. 14.) On April

21, 2015, Petitioner filed a reply to Respondent's answer. (Reply, ECF No. 35.)

---

[1] Petitioner, Tennessee Department of Correction ("TDOC") prisoner number 240115, is now
confined at the Northeast Correctional Complex ("NECX") in Mountain City, Tennessee.

[2] Petitioner brought this claim on September 4, 2014.

Also on April 21, 2015, Petitioner moved for leave to amend the amended petition to add a claim of ineffective assistance of counsel and to modify the issues raised in the amended petition. (Motion ("Mot."), ECF No. 18.) Without objection from Respondent, Judge Fowlkes granted the motion to amend and directed Respondent to respond to the second amended petition. (Order, ECF No. 20.) On November 17, 2017, Respondent answered the second amended petition. (Supplemental Answer, ECF No. 24.) On February 26, 2018, the case was reassigned to the undersigned judge. The second amended petition is the operative pleading here. (Second Am. Pet., ECF No. 18-1.)

As more fully discussed below, the issues Petitioner raises in the habeas petition fall into two categories: 1) whether the state court identified and applied the correct federal legal principles and 2) whether the claim is procedurally defaulted. For the reasons discussed below, the petition is DISMISSED.

## **BACKGROUND**

A Shelby County, Tennessee criminal court jury convicted Qawi Nur of one count of murder during the perpetration of an aggravated burglary (felony murder) and one count of second-degree murder in April 2009. (R., Minutes ("Mins."), ECF No. 14-1 at PageID 213.) The jury sentenced Petitioner to life in prison without the possibility of parole. (*Id.*) The trial court merged the conviction for second-degree murder into the conviction for felony murder. (R., Judgments, ECF No. 14-1 at PageID 216–17.) Petitioner appealed. (R., Notice of Appeal, ECF No. 14-1 at PageID 234.) The Tennessee Court of Criminal Appeals affirmed. *State v. Nur*, No. W2004-01259-CCA-R3-CD, 2005 WL 1467904 (Tenn. Crim. App. June 21, 2005), *perm. app. denied* (Tenn. Oct. 24, 2005).

On June 27, 2006, Petitioner filed a pro se petition in Shelby County Criminal Court under the Tennessee Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-101 *et seq.* (R., Pet. for Post-Conviction Relief, ECF No. 14-17 at PageID 1331.) Appointed counsel filed an amended petition timely. (R., Am. Pet., ECF No. 14-17 at PageID 1333.) On January 18, 2011, counsel filed a second amended petition. (R., Second Am. Pet., ECF No. 14-15 at PageID 1346.) The post-conviction court conducted an evidentiary hearing and denied relief in an order entered on January 28, 2013. (R., Order, ECF No. 14-17 at PageID 1376.) Petitioner appealed. (R., Notice of Appeal, ECF No. 14-17 at PageID 1389.) The Tennessee Court of Criminal Appeals affirmed. *Nur v. State*, No. W2013-00434-CCA-R3-PC, 2014 WL 260774 (Tenn. Crim. App. Jan. 22, 2014), *perm. app. denied* (Tenn. May 15, 2014).

On direct appeal, the Tennessee Court of Criminal Appeals summarized the evidence presented at trial:

> Christie Lee Holmes was the girlfriend of the victim, David Romanoli. Immediately prior to the shooting, Ms. Holmes, the victim, the victim's younger brother, James, and his friend, Steven Inglis, were sitting in a bathroom in the victim's second floor apartment smoking marijuana. The group heard someone kick the front door open. The victim left the bathroom, and Ms. Holmes heard him call out, asking who the intruder was and what he or she wanted.
>
> Ms. Holmes followed the victim as he ran down the stairs after the intruder. When she reached the ground floor, Ms. Holmes saw a black car drive by with its doors open. A woman was running after the car, trying to flag it down. Ms. Holmes chased the woman. The woman stopped, and an African-American man stepped out of some bushes near the apartment building. Ms. Holmes said that the woman told the man "to shoot [Ms. Holmes], shoot her, pop a cap in her ass, too." Ms. Holmes saw that the man was unarmed and demanded his name. The man and woman ran away.
>
> Ms. Holmes identified Defendant and Melissa Swift from photo line-ups as the man and woman she encountered outside the victim's apartment building. Ms. Holmes said that Defendant was wearing a white shirt, baggy jeans, and tennis shoes when she saw him. Ms. Holmes did not see the shooting nor did she hear gunshots.

3

David Barnwell, the victim's neighbor, said that he heard gunshots and stepped out onto his second-floor patio. He saw a woman run past his apartment followed by an African-American man wearing baggy jeans and a red baseball cap.

Officer Hope Bebout with the Memphis Police Department found a red cap in a bush next to the apartment building. A pair of red nylon sweat pants and a bandana were also found behind the building. Officer Robert Harris found a .38 caliber revolver in a bush next to the apartment building's back stairwell. Officer Sherman Bonds said that the .38 caliber revolver had four spent casings and two live rounds. Heath Barker, a special agent with the Tennessee Bureau of Investigation, testified that the bullet removed from the victim's body during the autopsy was fired from the .38 caliber revolver found at the crime scene.

Nina Sublette, a nurse practitioner, took a blood sample from Defendant for the purpose of DNA sampling. Special Agent Lawrence James attempted to obtain a DNA sample from the clothes found at the crime scene. Agent James was unable to secure a sample from the pants or bandana. The DNA sample taken from the red cap contained DNA from two contributors, one of whom was possibly Defendant. The DNA analysis indicated that the probability of obtaining that mixed profile from the African-American population is approximately one in eight. Although the DNA sample did not conclusively match Defendant's, he could not be excluded as a contributor.

Dr. Teresa Allen Campbell performed the victim's autopsy. Dr. Campbell said that the cause of death was a gunshot wound to the right side of the chest. The bullet struck the victim's left lung and aorta and did not exit the body. There was no soot around the wound indicating that the shooter was more than two feet from the victim when the gun was discharged.

Melissa Swift testified that she was indicted for first degree felony murder in connection with the victim's shooting, but pled guilty to the lesser included offense of facilitation of first degree felony murder. On the afternoon of the shooting, Ms. Swift met Coty Childress and Jennifer Mohrhoff at a gas station, and invited the women to her apartment to smoke marijuana. When the marijuana was gone, Ms. Childress said that the victim had a supply of marijuana and suggested that the group rob him. Ms. Swift called Defendant and asked him to go with the women. The three women picked Defendant up at his apartment and then drove to the victim's apartment building.

Ms. Swift said that she and Defendant went upstairs and knocked on the victim's front door. No one answered, and the two returned to the car. Defendant and Ms. Childress then went up the stairs while Ms. Swift waited outside. Ms. Childress knocked on the door, and, once again, no one answered. Defendant

kicked the front door down. Ms. Childress and Defendant went inside the apartment but ran back out in a few seconds. Defendant pushed Ms. Childress into Ms. Swift as he ran down the stairs. Ms. Childress hurt her ankle and ran toward the car. Ms. Swift said a man came down the stairs behind Defendant and Ms. Childress.

Ms. Swift ran around the corner of the apartment building. She saw Defendant coming toward her with a gun in his hand. Ms. Swift said that she heard gunshots but did not see Defendant shoot the victim. Defendant took off some of his clothes and hid the clothes and gun behind the apartment building. Ms. Swift said that she and Defendant got back into the car and returned to Ms. Swift's apartment. When he got into the car, Defendant said, "I think I shot him." Ms. Swift said that she was not armed that afternoon.

On cross-examination, Ms. Swift said that she saw Ms. Holmes as she ran away from the scene. Ms. Swift said she initially thought that the victim had fired a gun. She did not see Defendant's gun when he first got in the car prior to the incident. Defendant left Ms. Swift's apartment, and Ms. Swift and her friends ate dinner at a local restaurant.

Ms. Mohrhoff said that she was indicted for facilitation of first-degree felony murder in connection with the shooting. Ms. Mohrhoff generally confirmed Ms. Swift's description of the sequence of events that afternoon. Ms. Mohrhoff said that she and her friends, April Smith and Coty Childress, saw Ms. Swift and her friend, Dara Wiginton, at a gas station, and the group went to Ms. Swift's apartment to smoke marijuana. Ms. Mohrhoff said that Ms. Childress told them where they could get some more drugs. Ms. Mohrhoff drove Ms. Smith's car first to Defendant's apartment and then the victim's. Ms. Wiginton and Ms. Smith stayed behind at Ms. Swift's apartment.

Ms. Mohrhoff said that Ms. Swift and Defendant went to the victim's apartment on the second floor and knocked on the door. When no one answered the knock, Ms. Swift and Defendant came back downstairs. Ms. Childress and Defendant then went upstairs and knocked on the door. Ms. Mohrhoff said that Defendant came running down the stairs followed by Ms. Childress. The victim chased Ms. Swift and Defendant around a corner of the apartment building, and Ms. Mohrhoff heard gunshots. She and Ms. Childress drove off.

Ms. Mohrhoff said that she had trouble driving because she was so nervous, and pulled the car over to the side of the street. She saw Ms. Swift and Defendant run up behind the car. Both of them got in, and Ms. Swift directed Ms. Mohrhoff to drive back to Ms. Swift's apartment. Defendant said that he had fired his gun but did not know whether or not he had shot the victim.

Ms. Mohrhoff said that Defendant was wearing red pants and a tee shirt when he first got into the car, but she did not remember whether or not he was wearing a hat. Ms. Mohrhoff remembered seeing another woman at the crime scene that afternoon. Ms. Mohrhoff said that news of the shooting was on television that night, but the license plate number of the car reportedly seen at the scene was not Ms. Smith's. The group ate dinner at a local restaurant and then returned to Ms. Swift's apartment. Ms. Mohrhoff's next-door neighbor called and said that the police had Ms. Smith's license plate number. The police were waiting at Ms. Mohrhoff's apartment when she, Ms. Smith, and Ms. Childress arrived.

*State v. Nur*, 2005 WL 1467904, at *1–3.

The Tennessee Court of Criminal Appeal's opinion on Petitioner's post-conviction appeal summarized the evidence presented at the post-conviction hearing and the decision of the post-conviction trial court:

The post-conviction court conducted an evidentiary hearing, at which the petitioner's trial counsel testified that she had worked in the public defender's office for over twenty-one years. She said that the petitioner had a previous conviction for second degree murder. Because the State filed a notice of intent to seek the death penalty, the capital case team, of which counsel was a part, worked on the petitioner's case. Counsel recalled that she filed numerous motions on the petitioner's behalf.

Counsel stated that the State's case was based on the testimony of the victim's girlfriend, Christie Holmes, and two of the petitioner's accomplices, Melissa Swift and Jennifer Mohrhoff, as well as "DNA testing that could not exclude [the petitioner] as someone who had worn the clothing that had been discarded . . . running away from the scene." Swift pled guilty to facilitation of first-degree murder prior to the petitioner's trial, so counsel had no problem interviewing her. Counsel or a member of the defense team also interviewed several other witnesses from the apartment complex. Counsel was unable to interview Mohrhoff because her case was pending, and counsel was not sure whether Holmes was interviewed. However, counsel said that she had a copy of all their statements prior to trial. Counsel stated that Mohrhoff identified the petitioner out of a single photograph. She said that Coty Childress, another accomplice who did not testify at trial, identified the petitioner from a single photograph as well. Counsel was not sure if Childress was interviewed. Counsel filed motions to suppress the photographic identifications. Counsel cross-examined Mohrhoff and Holmes at a hearing to suppress their identifications.

Counsel testified that she interviewed the State's expert before trial and, after interviewing him, made the tactical decision to not call her own expert or seek independent testing. She was concerned that an independent test could return more incriminating results than the State's test, which she would be obligated to turn over, and because there were eyewitnesses who placed the petitioner at the scene. Counsel stated that the DNA evidence against the petitioner was not "real hard clad" and easily allowed her to argue reasonable doubt.

Regarding the alibi issue, counsel recalled that the petitioner initially told her that he was doing drugs and having an orgy with the three female accomplices on the morning of the crime and then he passed out and woke up around 11:00 p.m. or midnight. He said that a couple of days later he decided to go to New Orleans. Counsel recounted that the petitioner later changed his story and said that he was in New Orleans at the time of the crime. The petitioner gave her the name of Charrel Reed to call in New Orleans to confirm his story, and counsel or someone in her office attempted to contact Reed but was ultimately unable to confirm the petitioner's story. Moreover, by the time of trial, the petitioner was no longer insisting on an alibi defense. Their defense at trial was that the petitioner was not the shooter, "[o]r truthfully more trying to blow holes in the State's case." She said that, at trial, she attempted to discredit the State's witnesses and tried to raise doubt as to whether the petitioner was at the scene or had a gun. Other than Reed's name, the petitioner gave her no other names of alibi witnesses.

Regarding closing argument, counsel stated that she had no specific recollection of what she said but acknowledged that the transcript showed that in her closing argument she stated that the petitioner was present at the scene with the three accomplices and that he ran away. However, she explained that what she says in closing argument depends on the facts that come out at trial and that "you can't really argue something that is completely contrary to the facts that have come in[.]" Counsel said that, because eyewitnesses placed the petitioner at the scene, possibly her strategy was to agree that he was at the scene but not with a gun or involved in the incident.

The petitioner admitted that he had a prior conviction for second degree murder and that counsel informed him that the State was seeking the death penalty. He testified that he was arrested for the present crime in New Orleans and was represented by counsel and members of the Capital Defense Team of the Shelby County Public Defender's Office. He recalled that he met with counsel or a member of the defense team five or six times in the jail, in addition to meetings on several court dates. The petitioner admitted that his defense team interviewed witnesses and discussed the results of their investigation with him. He was given a copy of the discovery package but believed that it was missing some pages. He shared his concerns regarding the missing material via several letters to counsel.

He also tried to have counsel removed from his case. The petitioner said that he asked his lawyers to challenge the DNA evidence against him and that was the source of his disagreements with counsel and the defense team. He could not recall what they told him as to the reason for not retaining an independent DNA expert.

The petitioner acknowledged that counsel attempted to challenge the witnesses' identification of him, which was the strongest part of the State's case. However, he complained that counsel did not prepare a defense and that "her idea of challenging the identification [by] asking questions" was inadequate. He also complained that, in closing argument, counsel told the jury that he was "present at the scene and basically participated with the girls." He contended that there was no corroboration that he was at the scene and, thus, counsel's stating in closing argument that he was at the scene was ineffective. On cross-examination, the petitioner asserted he was not at the scene but admitted that no one testified at the hearing in support of that contention.

The petitioner testified that he told counsel that his defense was that he "was not there," and that he "always maintained actual innocence." He told counsel that he believed he knew who committed the crime, but he did not provide a name at the hearing. The petitioner admitted that he knew the co-defendants through his younger stepbrother and was friendly with them. The petitioner claimed that he told counsel that he was at a friend's apartment in Memphis at the time of the crime, which was not in the apartment complex where the murder occurred. He said that he also gave counsel the names of his potential alibi witnesses, but he did not know where those people were presently located. The petitioner insisted that counsel was confused when she testified that he told her two different versions of events. He said that he told her where he was on the day of the crime and that he "subsequently left and went to New Orleans on a trip that [he] had planned previously."

On cross-examination, the petitioner acknowledged that he did not have any witnesses who could say that he was not at the scene of the crime. However, he claimed that he told counsel that he was at "Derrick's" apartment at the time of the crime but acknowledged that Derrick was not present at the evidentiary hearing. The petitioner stated that he "was leaning to testify" at trial but decided not to based on the advice of counsel. He admitted that, since the trial, he had not consulted a DNA expert to testify that there were tests that should have been done.

*Nur v. State*, 2014 WL 260774, at *3–5.

8

## **LEGAL STANDARD**

Federal courts have authority to issue habeas corpus relief for persons in state custody under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). There are several potential barriers for state prisoners in seeking habeas relief from federal courts.

## I.     **Exhaustion and Procedural Default**

A federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless, with certain exceptions, the prisoner has exhausted available state remedies by presenting the same claim sought to be redressed in a federal habeas court to the state courts. 28 U.S.C. § 2254(b)–(c); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The petitioner must "fairly present"[3] each claim to all levels of state court review, up to and including the state's highest court on discretionary review, *Baldwin v. Reese*, 541 U.S. 27, 29 (2004), unless the state has explicitly disavowed state supreme court review as an available state remedy, *O'Sullivan v. Boerckel*, 526 U.S. 838, 847–48 (1999). Tennessee Supreme Court Rule 39 eliminates the need to seek review in the Tennessee Supreme Court to "be deemed to have exhausted all available state remedies." *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003); *see Smith v. Morgan*, 371 F. App'x 575, 579 (6th Cir. 2010).

---

[3] For a claim to be exhausted, "[i]t is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam) (internal citation omitted). Nor is it enough to make a general appeal to a broad constitutional guarantee. *Gray v. Netherland*, 518 U.S. 152, 163 (1996).

Another potential obstacle for state prisoners seeking federal intervention is the procedural default doctrine. The procedural default doctrine is ancillary to the exhaustion requirement. *See Edwards v. Carpenter*, 529 U.S. 446, 452–53 (2000) (noting the interplay between the exhaustion rule and the procedural default doctrine). If the state court decides a claim on an independent and adequate state ground, such as a procedural rule prohibiting the state court from reaching the merits of the constitutional claim, the procedural default doctrine ordinarily bars a petitioner from then seeking federal habeas review. *Wainwright v. Sykes*, 433 U.S. 72, 81–82 (1977); *see also Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment.") (internal quotation marks and citation omitted)).[4] In general, a federal court "may only treat a state court order as enforcing the procedural default rule when it unambiguously relied on that rule." *Peoples v. Lafler*, 734 F.3d 503, 512 (6th Cir. 2013).

If a petitioner's claim has been procedurally defaulted at the state level, the petitioner must show cause to excuse his failure to present the claim and actual prejudice stemming from the constitutional violation or that a failure to review the claim will result in a fundamental miscarriage of justice. *Schlup v. Delo*, 513 U.S. 298, 320–21 (1995); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). The latter showing requires a petitioner to establish that a constitutional

---

[4] The state-law ground may be a substantive rule dispositive of the case, or a procedural barrier to adjudication of the claim on the merits. *Walker*, 562 U.S. at 315. A state rule is an "adequate" procedural ground if it is "firmly established and regularly followed." *Id.* at 316 (quoting *Beard v. Kindler*, 558 U.S. at 60–61 (2009)). "A discretionary state procedural rule . . . can serve as an adequate ground to bar federal habeas review . . . even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." *Id.* (quoting *Kindler*, 558 U.S. at 54.) (internal quotation marks and citations omitted).

error has probably resulted in the conviction of a person who is actually innocent of the crime.

*Schlup*, 513 U.S. at 321; *see also House v. Bell*, 547 U.S. 518, 536–39 (2006) (restating the ways to overcome procedural default and continuing to explain the actual innocence exception).

## II.    Merits Review

If the petition clears the procedural hurdles referenced above, the Court examines the merits of the claim.  Under § 2254(d), where a state court adjudicates a claim on the merits, a federal court should grant a habeas petition only if resolving the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).  Petitioner carries the burden of proof on this "difficult to meet" and "highly deferential [AEDPA] standard," which "demands that state-court decisions be given the benefit of the doubt."  *Cullen*, 563 U.S. at 181 (quoting *Harrington v. Richter*, 562 U.S. 86, 102 (2011); *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).

Review under § 2254(d)(1) is limited to the record before the state court that adjudicated the claim on the merits.  *Cullen*, 563 U.S. at 182.  Considering the enumerated standard mentioned above under § 2254(d)(1), a state court's decision is "contrary" to federal law when it (a) "arrives at a conclusion opposite to that reached" by the Supreme Court on a question of law or (b) "decides a case differently than" the Supreme Court has "on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000).  An "unreasonable application" of federal law occurs when the state court "identifies the correct governing legal principle from" the Supreme Court's decisions "but unreasonably applies that principle to the

11

facts of the prisoner's case." *Id.* The state court's application of clearly established federal law must be "objectively unreasonable" for the writ to issue. *Id.* at 409. The writ may not issue just because the habeas court, "in its independent judgment," determines that the "state court decision applied clearly established federal law erroneously or incorrectly." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citing *Williams*, 529 U.S. at 411).

There is scant case law addressing whether, under § 2254(d)(2), a decision was based on "an unreasonable determination of the facts." In *Wood v. Allen*, 558 U.S. 290, 301 (2010), the Supreme Court found that a state-court factual determination is not "unreasonable" just because the federal habeas court would have reached a different conclusion.[5] In *Rice v. Collins*, the Court explained that "[r]easonable minds reviewing the record might disagree" about the factual finding in question, "but on habeas review that does not suffice to supersede the trial court's . . . determination." 546 U.S. 333, 341–42 (2006).

The Sixth Circuit has described the § 2254(d)(2) standard as "demanding but not insatiable" and has emphasized that, under § 2254(e)(1), the state court factual determination is presumed to be correct absent clear and convincing evidence to the contrary. *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010). A state court adjudication will not be overturned on factual grounds unless objectively unreasonable given the evidence presented during the state court proceeding. *Id.*; *see also Hudson v. Lafler*, 421 F. App'x 619, 624 (6th Cir. 2011) (same).

---

[5] In *Wood*, the Supreme Court granted certiorari to resolve whether, to satisfy § 2254(d)(2), "a petitioner must establish only that the state-court factual determination on which the decision was based was 'unreasonable,' or whether § 2254(e)(1) additionally requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence." *Wood*, 558 U.S. at 299. The Court found it unnecessary to reach that issue, and left it open "for another day". *Id.* at 300–01, 303 (citing *Rice v. Collins*, 546 U.S. 333, 339 (2006), in which the Court recognized that it is unsettled whether there are some factual disputes to which § 2254(e)(1) is inapplicable).

III.    **Ineffective Assistance of Counsel**

A.      **Standard governing ineffective assistance claims at trial.**

The standards announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), govern claims that ineffective assistance of counsel deprived a defendant of his Sixth Amendment right to counsel. To succeed on this claim, a movant must demonstrate two elements: 1) that counsel's performance was deficient, and 2) "that the deficient performance prejudiced the defense." *Id.* "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

The Court will now address the *Strickland* elements one at a time. To establish that counsel gave a deficient performance, the movant "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. A court considering a claim of ineffective assistance is to apply a "strong presumption" that counsel's representation was within the "wide range of reasonable professional assistance." *Id.* at 689. The challenger's burden then is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.

To demonstrate that counsel's performance prejudiced the defense, a petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.[6] "A reasonable probability is a probability sufficient to undermine confidence in the outcome. It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' Counsel's errors must be 'so serious

---

[6] If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. *Strickland*, 466 U.S. at 697.

as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Harrington*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 693–94); *see also Wong v. Belmontes*, 558 U.S. 15, 27 (2009) (per curiam) ("But *Strickland* does not require the State to 'rule out'" a more favorable outcome to prevail. "Rather, *Strickland* places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different.").

The deference federal courts confer to a state-court decision under 28 U.S.C. § 2254(d) is magnified when it reviews an ineffective assistance claim:

> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult. The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. . . The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 562 U.S. at 105 (citation omitted).

**B.      Standard governing ineffective assistance claims at appellate stage.**

Criminal defendants are entitled to the effective assistance of counsel on direct appeal. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985). As with trial counsel, courts evaluate claims of ineffective assistance of appellate counsel under the *Strickland* standards. *Smith v. Robbins*, 528 U.S. 259, 285–86 (2000) (applying *Strickland* to claim that appellate counsel rendered ineffective assistance by failing to file a merits brief); *Smith v. Murray*, 477 U.S. 527, 535–36 (1986) (failure to raise issue on appeal). To establish that appellate counsel was ineffective, a prisoner

> must first show that his counsel was objectively unreasonable in failing to find arguable issues to appeal—that is, that counsel unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them. If [the prisoner]

succeeds in such a showing, he then has the burden of demonstrating prejudice. That is, he must show a reasonable probability that, but for his counsel's unreasonable failure to file a merits brief, he would have prevailed on his appeal.

*Robbins*, 528 U.S. at 285 (citation omitted).[7]

That said, the failure to raise a nonfrivolous issue on appeal does not constitute per se ineffective assistance of counsel because lawyers make judgment calls about which issues to raise on appeal. With that in mind the Supreme Court said "[t]his process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Murray*, 477 U.S. at 536 (internal quotation marks and citation omitted). An appellate counsel's ability to choose those arguments that are more likely to succeed is "the hallmark of effective appellate advocacy." *Matthews v. Parker*, 651 F.3d 489, 523 (6th Cir. 2011) (quoting *Caver v. Straub*, 349 F.3d 340, 348 (6th Cir. 2003)). It is difficult to show that appellate counsel was deficient for raising one issue, rather than another, on appeal. *See id.* "In such cases, the petitioner must

---

[7] The Sixth Circuit has identified a nonexclusive list of factors to consider when assessing claims of ineffective assistance of appellate counsel:

1. Were the omitted issues "significant and obvious?"
2. Was there arguably contrary authority on the omitted issues?
3. Were the omitted issues clearly stronger than those presented?
4. Were the omitted issues objected to at trial?
5. Were the trial court's rulings subject to deference on appeal?
6. Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
7. What was the appellate counsel's level of experience and expertise?
8. Did the petitioner and appellate counsel meet and go over possible issues?
9. Is there evidence that counsel reviewed all the facts?
10. Were the omitted issues dealt with in other assignments of error?
11. Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Franklin v. Anderson*, 434 F.3d 412, 429 (6th Cir. 2006) (citation omitted).

demonstrate that the issue not presented was clearly stronger than issues that counsel did present." *Id.* The movant must show that "there is a reasonable probability that inclusion of the issue would have changed the result of the appeal." *McFarland v. Yukins*, 356 F.3d 688, 699 (6th Cir. 2004).

C. **Standard governing ineffective assistance claims during post-conviction proceedings.**

At the post-conviction stage, constitutional protections erode. "There is no constitutional right to an attorney in state post-conviction proceedings. Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." *Coleman*, 501 U.S. at 752 (internal citations omitted). Attorney error cannot constitute "cause" for a procedural default "because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must bear the risk of attorney error." *Id.* at 753 (internal quotation marks omitted). When the State has no constitutional obligation to ensure that a prisoner is represented by competent counsel, the petitioner bears the risk of attorney error. *Id.* at 754.

In 2012, the Supreme Court decided *Martinez v. Ryan*, , which recognized a narrow exception to the rule in *Coleman*, "[w]here, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding . . . ." 566 U.S. 1, 17 (2002). In such cases, "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance [of counsel] at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Id.* The Supreme Court also emphasized that "[t]he rule of *Coleman* governs in all but the limited circumstances recognized here. . . . It does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at

trial, even though that initial-review collateral proceeding may be deficient for other reasons."

*Id.* Courts will excuse a procedural default under *Martinez* when a petitioner satisfies these requirements:

> (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law *requires* that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (emphasis and alterations in original).

*Martinez* considered an Arizona law that did not permit petitioners to raise ineffective assistance claims on direct appeal. 566 U.S. at 4. In the Supreme Court's later decision in *Trevino*, 569 U.S. at 429, the Court extended its holding in *Martinez* to states in which a "state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal . . . ." *Trevino* modified the fourth *Martinez* requirement for overcoming a procedural default. *Martinez* and *Trevino* apply to Tennessee prisoners. *Sutton v. Carpenter*, 745 F.3d 787, 790 (6th Cir. 2014).

## ANALYSIS

In the second amended § 2254 petition, Petitioner raises these issues:

1. The evidence was insufficient to support his conviction for felony murder (Second Am. Pet., ECF No. 18-1 at PageID 1878-79);

2. Trial counsel provided ineffective assistance by failing to investigate inconsistencies in his accomplices' statements (*id.* at PageID 1881);

3. Trial counsel provided ineffective assistance by failing to retain an expert for DNA testing (*id.* at PageID 1882);

4. Post-conviction counsel provided ineffective assistance by failing to contend that trial and appellate counsel performed deficiently by failing to challenge the trial court's jury instructions (*id.* at PageID 1884-85);

5. Post-conviction counsel provided ineffective assistance by failing to argue that trial and appellate counsel were ineffective by failing to challenge the corroborating testimony, or in the alternative, if there was corroborating testimony, failing to challenge the essential facts necessary to convict petitioner of felony murder[8] (*id.* at PageID 1885); and

6. Post-conviction counsel provided ineffective assistance by failing to raise on post-conviction appeal the claim that trial counsel failed to conduct an adequate investigation. (*Id.* at PageID 1885.)

Petitioner presented Issue 1 to the Tennessee Court of Criminal Appeals on direct appeal. (R., Brief ("Br.") of Appellant, ECF No. 14-13 at PageID 1269-71.) Petitioner also presented Issues 2 and 3 to the Tennessee Court of Criminal Appeals in the post-conviction appeal. (R., Br. of the Appellant, ECF No. 14-23 at PageID 1793-98.) Petitioner never raised Issue 6 before the Tennessee Court of Criminal Appeals, although he did raise it before the post-conviction trial court. (R., Order, ECF No. 14-17 at PageID 1380-83.) That court denied the petition on Issue 6. (*Id.*) Petitioner never raised Issues 4 and 5 before the Tennessee Courts.

## I. Exhausted Claims

### A. Was the evidence sufficient to uphold Petitioner's conviction?

Petitioner contends the Tennessee Court of Criminal Appeal's determination that the evidence was enough to support his conviction for felony murder was an unreasonable application of clearly established federal law "and/or" based on an unreasonable determination of

---

[8] Petitioner has presented the corroboration issue as two separate claims in the second amended petition. (Second Am. Pet., ECF No. 18-1 at PageID 1885–86.) Both issues contend the post-conviction counsel should have raised claims that trial and appellate counsel were deficient in challenging the corroborating witness' testimony. The Court construes the other "amended" issue of the second amended petition as additional argument for the original corroboration claim (Am. Pet., ECF No. 9 at PageID 39-40) and will address the allegations as one claim.

the facts. (Second Am. Pet., ECF No. 18-1 at PageID 1878–79.) In particular, Petitioner

contends that the corroborating witness never saw him in the victim's apartment and never saw

him with a gun. (*Id.* at PageID 1879.) In reply, Respondent argues that the Tennessee Court of

Criminal Appeals did apply the correct federal rule and that its decision was based on a

reasonable determination of the facts. (Answer, ECF No. 13 at PageID 93–97.)

After reviewing the evidence presented at trial, the Tennessee Court of Criminal Appeals

considered Petitioner's argument and opined:

> When a defendant challenges the sufficiency of the convicting evidence,
> we must review the evidence in a light most favorable to the prosecution in
> determining whether a rational trier of fact could have found all the essential
> elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S.
> 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). Once a jury finds a
> defendant guilty, his or her presumption of innocence is removed and replaced
> with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991).
> The defendant has the burden of overcoming this presumption, and the State is
> entitled to the strongest legitimate view of the evidence along with all reasonable
> inferences which may be drawn from that evidence. *Id.*; *State v. Tuggle*, 639
> S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all
> conflicts and drawn any reasonable inferences in favor of the State. *State v.
> Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the
> credibility of witnesses, the weight and value to be given the evidence, and all
> factual issues raised by the evidence are resolved by the trier of fact and not this
> court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are
> applicable to findings of guilt predicated upon direct evidence, circumstantial
> evidence, or a combination of both direct and circumstantial evidence. *State v.
> Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

> Defendant was convicted of first degree felony murder which, as relevant
> to the case *sub judice*, is defined as "[a] killing of another committed in the
> perpetration of or attempt to perpetrate any . . . burglary. . . ." Tenn. Code Ann. §
> 39-13-202(a)(2). A burglary is committed when a person enters a building
> without the consent of the owner with the intent to commit a felony. *Id.* § 39-14-
> 402(a)(1). Especially aggravated burglary is defined as a burglary of a habitation
> where the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-404(a).

> The State's proof rested primarily on the testimony of Defendant's two
> accomplices and the corroboration of the eyewitness to identify Defendant as the
> perpetrator of the offense. It is well settled that a conviction may not rest solely

on an accomplice's uncorroborated testimony. *State v. Shaw*, 37 S.W.3d 900, 903 (2001). The proof necessary to corroborate the accomplice's testimony must include "some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity." *Id.* (quoting *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994)).

Ms. Holmes testified that she followed the victim down the stairs to the ground floor. When she reached the bottom of the stairs, Ms. Holmes saw a woman and a man running away from the apartment building whom she later identified as Defendant and Ms. Swift. Ms. Holmes said that Ms. Swift told Defendant "to shoot [Ms. Holmes], shoot her, pop a cap in her ass, too," but Defendant was not armed at that time. Corroborating evidence need not be sufficient in and of itself to support a conviction as long as it fairly connects the defendant with the commission of the crime. *State v. Gaylor*, 862 S.W.2d 546, 522 (Tenn. Crim. App. 1992). Ms. Holmes corroborated Ms. Swift's and Ms. Muhrhoff's testimony that Defendant was in the victim's apartment building and later ran away from the crime scene with Ms. Swift. Ms. Holmes' testimony implicates Defendant in the shooting and positively identifies him as a participant. Whether the testimony of an accomplice is sufficiently corroborated is a question for the jury. *State v. Heflin*, 15 S.W.3d 519, 524 (Tenn. Crim. App. 1999). Based on our review of the record, the evidence is sufficient to support a finding that Ms. Swift's and Ms. Muhrhoff's testimony was sufficiently corroborated.

Ms. Swift and Ms. Muhrhoff testified that they picked up Defendant and drove to the victim's apartment to steal marijuana. Defendant kicked down the victim's door and soon came running back down the stairs with the victim behind him. Both women heard gunshots. Ms. Swift rounded the corner of the apartment building and saw Defendant with a gun in his hand. Ms. Swift saw Defendant hide the gun at the back of the building. The gun later retrieved from a bush in this area was determined to be the weapon which fired the fatal shot. Ms. Muhrhoff said Defendant was wearing red pants when he joined the group, and a pair of red nylon sweat pants was found in a bush behind the victim's apartment building. Defendant told Ms. Swift and Ms. Muhrhoff that he had fired his weapon but did not know whether he hit the victim.

Viewing the evidence in a light most favorable to the State, we find that the evidence was sufficient to support Defendant's conviction of first degree felony murder beyond a reasonable doubt.

*State v. Nur*, 2005 WL 1467904, at *3–5.

In *Jackson v. Virginia*, 443 U.S. 307, 324 (1979), the Supreme Court held that, "in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254—if the settled procedural prerequisites for such a claim have otherwise been satisfied—the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof beyond a reasonable doubt." This standard requires a federal district court to examine the evidence in the light most favorable to the State. *Id.* at 326 ("[A] federal habeas corpus court faced with a record of conflicting facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.").

Petitioner argues that the corroborating witness did not testify that she saw him in the victim's building or that she saw him with a gun. (Second Am. Pet., ECF No. 18-1 at PageID 1879.) He contends that testimony fails to establish the essential elements of felony murder. (*Id.*) Petitioner's claims here fail to satisfy his burden of proving that the state court's resolution of this issue was based on an unreasonable determination of the facts. Petitioner's argument establishes, at most, that the jury needed to determine whether Holmes' testimony connected Petitioner with the commission of the crime and was enough to corroborate the testimony of the accomplices. The jury concluded that Holmes' testimony was sufficient.

The Tennessee Court of Criminal Appeals applied the correct legal rule and cited both *Jackson v. Virginia* and state cases applying the *Jackson* standard. *See State v. Nur*, 2006 WL 1467904, at *3. The Tennessee Court of Criminal Appeals found that the "evidence was sufficient to support a finding that Ms. Swift's and Ms. Murhoff's [testimonies were] sufficiently corroborated." *Id.*, at *4. Based on this Court's review of the transcript of Petitioner's trial (R., Trial Transcript ("Tr."), ECF Nos. 14-6, 14-7, and 14-8), the Tennessee Court of Criminal

Appeals correctly concluded that Holmes' testimony was enough to corroborate the accomplices' testimonies. The testimony and evidence were more than sufficient to permit the jury to find that Petitioner was guilty of felony murder. Issue 1 lacks merit and is DENIED.

**B.     Did trial counsel provide ineffective assistance by failing to investigate inconsistencies in Petitioner's accomplices' statements?**

Petitioner contends that trial counsel failed to "investigate the contradictions and inconsistencies put before the jury" when his accomplices testified. (*Id.*) And he argues that the record does not reveal whether Coty Childress gave a statement to police. (*Id.*) Respondent replies that the state court's application of *Strickland* was correct and was not based on an unreasonable determination of the facts. (Answer, ECF No. 13 at PageID 101-03.)

The Tennessee Court of Criminal Appeals identified the proper standard for analyzing the claim of ineffective assistance, *Strickland*, 466 U.S. at 687. *Nur v. State*, 2014 WL 260774, at *6. The appellate court reviewed the post-conviction trial court's determination and opined:

> The petitioner argues that he received the ineffective assistance of counsel because counsel failed to investigate inconsistencies in the statements of his accomplices. By referring this court to his amended petition, the petitioner elaborates that the "inconsistencies" were in the statement of Coty Childress and the "identical" statements of Jennifer Mohrhoff and Melissa Swift, detailing who was present at Swift's house and how the petitioner came to be with them. However, an examination of the record before this court does not reveal what statement, if any, Coty Childress gave to the police, and no proof was developed at the evidentiary hearing on this matter. Thus, there is no way to determine whether counsel performed deficiently or whether the petitioner was prejudiced because of any failure to investigate said inconsistencies. The petitioner suggests in his brief that counsel performed deficiently by not challenging the photographic identification of him as being tainted "based on inconsistent statements" and by not exploring the relationship between the victim's girlfriend, Christie Holmes, and Coty Childress, but he also presented no proof in support of or developed such issues.

*Nur v. State*, 2014 WL 260774, at *7.

Trial counsel testified at the post-conviction hearing that she had the statements of Swift, Mohrhoff, and Holmes before trial. (R., Post-conviction Tr., ECF No. 14-20 at PageID 1682, 1694.) The record demonstrates that the State gave counsel open-file discovery before trial and that Petitioner's lawyer filed a motion to suppress Coty Childress' statement. (R., Pretrial Hearing ("H'g") Tr., ECF No. 14-10 at PageID 1228.) That motion hearing was cancelled when the State notified counsel that Childress would not be a trial witness. (*Id.*) Trial counsel interviewed Swift before Peitioner's trial. (R., Post-conviction Tr., ECF No. 14-20 at PageID 1596.) Because Mohrhoff's case was pending, counsel could not interview her. (*Id.* at PageID 1683.) Counsel thoroughly cross-examined both Holmes and Mohrhoff during the hearings on the motions to suppress identifications. (R., Suppression H'rg Tr., ECF Nos. 14-9, 14-10.) The suppression hearing testimonies of Holmes and Mohrhoff tracked their trial testimonies. (*Id.*; Trial Tr., ECF No. 14-6 at PageId 414-426, ECF No 14-7 at PageID 954-631.)

Petitioner presented no statement by Childress nor was Childress called as a witness during the post-conviction hearing. Instead, Petitioner makes conclusory allegations. The Court is therefore left to speculate about any testimony Childress might have given and whether that testimony would be inconsistent with her undisclosed prior statement. Petitioner's conclusory allegations about the testimony of uncalled witnesses cannot demonstrate prejudice. *See Adams v. Jago*, 703 F.2d 978, 981 (6th Cir. 1983). Petitioner has identified no alleged contradictions and inconsistences in the trial testimonies of Holmes, Swift, and Mohrhoff for this Court's examination.

Based on this Court's review of the transcript of Petitioner's post-conviction hearing, (R., Post-Conviction Hearing ("Hr'g.") Transcript ("Tr."), ECF No. 25-15) and the transcript of Petitioner's trial (R., Trial Tr., ECF No. 25-4, 24-5, 24-6), the Tennessee Court of Criminal

Appeal's determination was not an unreasonable determination of the facts. Petitioner does not

provide argument or evidence that refutes the presumption of correctness accorded the state

court's factual determination. A state court's factual findings are entitled to a presumption of

correctness without any clear and convincing evidence to the contrary. 28 U.S.C. §§ 2254(d)(2),

2254(e)(1). Issue 2 is DENIED.

### C.    Did trial counsel provide ineffective assistance by failing to retain a DNA expert?

Petitioner contends that his trial counsel performed deficiently by not retaining an

independent DNA expert to analyze the cap and clothing found at the scene. (*Id.*) Petitioner

denies that the cap belonged to him and contends that his counsel's decision to forego further

DNA testing left the testimony of the State's expert witness unchallenged. (*Id.*) Respondent

replies that appellate court addressed and rejected this issue and that the appellate court's

determination was not contrary to or an unreasonable application of clearly established federal

law or an unreasonable determination of the facts. (Answer, ECF No. 13 at PageID 104.)

The Tennessee Court of Criminal Appeals reviewed the determination of the post-

conviction court and determined:

> The petitioner argues that he received the ineffective assistance of counsel because counsel failed to request independent DNA testing of a red cap found at the scene. Counsel testified that she made the tactical decision to not call her own expert or seek independent testing because she was concerned that an independent test could return more incriminating results than the State's test, which she would be obligated to turn over, and because there were eyewitnesses who placed the petitioner at the scene. Counsel stated that the DNA evidence against the petitioner was not "real hard clad" and easily allowed her to argue reasonable doubt. The post-conviction court accredited counsel's testimony and noted that its function was not to second guess tactical and strategic decisions concerning defense matters. The petitioner has, therefore, failed to prove that counsel performed deficiently. Moreover, the petitioner has not consulted with a DNA expert or provided any evidence to show that additional testing would have been beneficial and, thus, has not shown prejudice.

Along these lines, the petitioner also alleges that counsel failed to subject the firearm and other physical evidence retrieved from the scene to further testing. The petitioner presented no evidence on this issue at the evidentiary hearing to show that the failure to conduct further testing on these items prejudiced his case.

*Nur v. State*, 2014 WL 260774, at *8.

Based on this Court's review of the post-conviction testimony (R., Post-conviction Hr'g. Tr., ECF No. 14-20, 14-21, 14-22), as well as the transcript of trial (R., Trial Tr., ECF No. 14-6, 14-7, ECF No. 14-8), counsel's strategic decision against the use of an independent DNA expert was not unreasonable because the State's expert's opinions were not particularly damaging to Petitioner's case. At trial the State's DNA expert testified that the pants and bandana did not have enough DNA for a determination. (R., Trial Tr., ECF No. 14-7 at PageID 912.) The expert testified that the DNA on the hat was not a "conclusive definitive match" to Petitioner, but the expert could not exclude Petitioner from the result. (*Id.* at PageID 913.) On cross-examination, the expert admitted that there was DNA from at least one other person found on the hat and that at least two African American males in the courtroom would match the DNA sample from the hat. (*Id.* at PageID 916.)

Counsel admitted that, had independent test results excluded Petitioner, that testimony would have helped the case. (R., Post-conviction Hr'g. Tr., ECF No. 14-20 at PageID 1686.) Counsel was worried that independent testing might reveal a positive DNA match and the State would be able to use that evidence against Petitioner. (*Id.* at PageID 1704.) The State's lack of concrete DNA evidence gave counsel a point to argue. (*Id.* at 1705.) Defense counsel's decision against retaining an independent expert witness was a sound tactical decision. The Tennessee Court of Criminal Appeal's decision comports with *Strickland*. Issue 3 is DENIED.

## II.    Issues Barred by Procedural Default

Petitioner contends that post-conviction counsel should have challenged trial counsel's failure to challenge the jury instructions and should have challenged trial and appellate counsel's failure to attack the corroborating testimony or lack of corroborating testimony.  (*Id.* at PageID 1884-85.)  Respondent replies that the doctrine of procedural default bars these claims because Petitioner did not raise them in the post-conviction petition or during the post-conviction appeal. (Answer, ECF No. 13 at PageID 105–06.)  Petitioner contends that this Court should excuse his default of these claims because of the ineffective assistance of post-conviction counsel.  (Second Am. Pet., ECF No. 18-1 at 1884-85.)  Respondent contends that the claims are not substantial. (Supplemental Answer, ECF No. 24 at PageID 1923.)

### A.    Did Petitioner's post-conviction counsel provide ineffective assistance by failing to contend that trial and appellate counsel performed deficiently by failing to challenge the trial court's jury instructions?

Petitioner contends the jury instructions were confusing and he was prejudiced when trial counsel failed to challenge the instructions.  (Second Am. Pet., ECF No. 18-1 at PageID 1084.) Petitioner has failed to specify the jury instructions he considers confusing or set forth a factual basis demonstrating jury confusion.  The Court has reviewed the record and found no evidence of jury confusion from the instructions.  Petitioner has failed to establish that, had counsel objected to the legal accuracy of the instructions, the trial court would have sustained the objection.  Petitioner has failed to establish deficient performance or prejudice by counsel and has failed to establish that this issue was substantial under *Martinez*.  Petitioner has not satisfied the requirements to overcome the procedural default of this issue.  Issue 4 is DENIED.

**B. Did post-conviction counsel provide ineffective assistance by failing to argue that trial and appellate counsel were ineffective by failing to challenge the corroborating testimony, or in the alternative, if there was corroborating testimony, failing to challenge the essential facts necessary to convict petitioner of felony murder?**

Ineffective assistance of state post-conviction counsel can establish cause to excuse a Tennessee prisoner's procedural default of a substantial federal habeas claim that his trial counsel was constitutionally ineffective. *Sutton*, 745 F.3d at 787. To qualify as "substantial" under *Martinez*, a claim must have "some merit" based on the controlling standard for ineffective assistance of counsel. *Martinez*, 566 U. S. at 14. Ineffective assistance of appellate counsel is not a trial error and is not subject to *Martinez* review. *Davila v. Davis*, 137 S. Ct. 2058, 2066-70 (2017.)

Petitioner tries to recharacterize the sufficiency of the corroborating testimony issue as a claim of ineffective assistance of counsel, but he fails to allege any factual basis for his contention that his trial attorney was ineffective in the manner that counsel argued this issue at trial or raised it on appeal. Petitioner repeats his argument that the jury convicted him based on the testimonies of accomplices and that Holmes' testimony was insufficient to corroborate the accomplices' testimonies. The jury and appellate court disagreed.

Based on this Court's review of the transcript of Petitioner's trial (R., Trial Transcript ("Tr."), ECF Nos. 14-6, 14-7, and 14-8), the Tennessee Court of Criminal Appeals correctly concluded that Holmes' testimony was enough to corroborate the accomplices' testimonies. The testimony and evidence were more than sufficient to permit the jury to find that Petitioner was guilty of felony murder.

Petitioner has failed to articulate any mistakes such as unasked questions on cross-examination, unmade objections to testimony, or argument by counsel that would have

27

potentially changed the outcome of his trial.  Because Petitioner has failed to establish deficient

performance or prejudice, he cannot establish that this claim is substantial under *Martinez*.

Petitioner cannot overcome his procedural default.  Issue 5 lacks merit and is DENIED.

### C.  Did post-conviction counsel provided ineffective assistance by failing to raise on post-conviction appeal the claim that trial counsel failed to conduct an adequate investigation?

Petitioner contends that trial counsel failed to conduct an adequate investigation and post-

conviction counsel should have raised this claim in the post-conviction appeal.  (*Id.* at PageID

1885.)  Respondent replies that Petitioner is barred from bringing this claim by procedural

default because he did not raise it during the post-conviction appeal.  (Answer, ECF No. 13 at

PageID 105.)

Trial counsel testified at the post-conviction hearing that she had the statements of Swift,

Mohrhoff, and Holmes before trial, that the State gave her open file discovery, that she filed

motions to suppress, and that she interviewed accomplice Swift before Petitioner's trial.  (R.,

Post-conviction Tr., ECF No. 14-20 at PageID 1682, 1694.)  The trial record supports her

testimony.  (R., Pretrial Hearing ("H'g") Tr., ECF No. 14-10 at PageID 1228.)  Because

Mohrhoff's case was pending, counsel could not interview her.  (R., Post-conviction Tr., ECF

No. 14-20 at PageID 1683.)  When Petitioner "changed his story," trial counsel filed a notice of

alibi and sought to track down the alibi witness in New Orleans.  (*Id.* at PageID 1688–90.)

Counsel or her investigator interviewed or tried to interview witnesses from the victim's

apartment complex.  (*Id.* at PageID 1696.)

Petitioner's testimony lumps several contentions into this catch-all argument.  He

testified that he met with trial counsel's investigator.  (R., Post-conviction Tr., ECF No. 14-21 at

PageID 1728.)  Petitioner admitted that the investigator spoke with witnesses and shared the

results of the investigation with him. (*Id.* at PageID 1729.) Petitioner also testified that he believed his discovery package was missing three pages of two police reports and one or two statements. (*Id.*) And as noted above, Petitioner stated that he wanted defense counsel to challenge the DNA evidence and her failure to do so was the source of their disagreement. (*Id.* at PageID 1734–35.) Another contention by Petitioner is that Holmes gave three different statements and counsel did not challenge any of them. (*Id.* at PageID 1738.) As Petitioner testified, "it's a lot of areas that I tried to get Ms. Thackery to help me in and she didn't." (*Id.* at PageID 1739.) Petitioner testified that he gave the investigator the names of alibi witnesses, but at the post-conviction hearing he did not know where those witnesses were. (*Id.* at PageID 1740.) On cross-examination, Petitioner admitted that he did not have any witnesses who would say he wasn't present at the crime. (*Id.* at PageID 1743.)

The post-conviction court addressed the issue, stating, "Petitioner testified at the post-conviction evidentiary hearing that he could provide no witnesses that would say he was not present at the crime scene." (R., Order, ECF No. 14-17 at PageId 1380.) The post-conviction court found that counsel "prepared her theory of the case based upon her investigation and information Petitioner provided her" and counsel's "decision not to investigate further these inconsistencies in witness and co-conspirator statements of any alternate theory of defense was a reasonable decision based upon a thorough investigation of law and facts." (R., Order, ECF No. 14-17 at PageId 1381-82.) Petitioner abandoned this claim on post-conviction appeal.

Ineffective assistance of state post-conviction counsel can establish cause to excuse a Tennessee prisoner's procedural default of a substantial federal habeas claim that his trial counsel was constitutionally ineffective. *Sutton*, 745 F.3d at 787. To qualify as "substantial"

under *Martinez*, a claim must have "some merit" based on the controlling standard for ineffective assistance of counsel. *Martinez*, 566 U.S. at 14.

*Martinez* and *Trevino* cannot excuse Petitioner's default of this claim of ineffective assistance. *Martinez* does not encompass claims that post-conviction appellate counsel was ineffective. *See Martinez*, 566 U.S. at 15 ("*Coleman* held that an attorney's negligence in a post-conviction proceeding does not establish cause, and this remains true except as to initial- review collateral proceedings for claims of ineffective assistance of counsel at trial.") The procedural default of this claim of ineffective assistance occurred when post-conviction counsel exercised his discretion to limit the brief to the Tennessee Court of Criminal Appeals to the strongest arguments. Appellate counsel has no duty to raise baseless issues and may exercise his discretion to limit a brief to the appellate court to the strongest arguments. Issue 6 is barred by procedural default and is DENIED.

The issues raised in this petition are barred by procedural default and without merit. The § 2254 Petition is, therefore, DENIED. This Court will enter Judgment in favor of Respondent.

## APPELLATE ISSUES

There is no absolute entitlement to appeal a district court's denial of a § 2254 petition. *Miller-El v. Cockrell*, 537 U.S. 322, 335 (2003). The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner. Rule 11, Rules Governing Section 2254 Cases in the United States District Courts. A petitioner may not take an appeal unless a circuit or district judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right, and the COA must indicate the specific issue or issues that satisfy the

required showing. 28 U.S.C. §§ 2253(c)(2)–(3). A petitioner makes a "substantial showing" when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 336 (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)); *see also Henley v. Bell*, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (holding a prisoner must demonstrate that reasonable jurists could disagree with the district court's resolution of his constitutional claims or that the issues presented warrant encouragement to proceed even more).

A COA does not require a showing that the appeal will succeed. *Miller-El*, 537 U.S. at 337; *Caldwell v. Lewis*, 414 F. App'x 809, 814–15 (6th Cir. 2011) (same). Courts should not issue a COA as a matter of course. *Bradley v. Birkett*, 156 F. App'x 771, 773 (6th Cir. 2005) (quoting *Slack*, 537 U.S. at 337).

Here, there can be no question that the claims in this petition are barred by procedural default and without merit. Because any appeal by Petitioner on the issues raised in this petition does not deserve attention, the Court DENIES a certificate of appealability.

Here for the same reasons the Court denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith. It is therefore CERTIFIED, under Fed. R. App. P. 24(a), that any appeal here would not be taken in good faith, and leave to appeal in forma pauperis is DENIED.[9]

---

[9] If Petitioner files a notice of appeal, he must pay the full $505 appellate filing fee or move to proceed in forma pauperis along with a supporting affidavit in the Sixth Circuit Court of Appeals within thirty (30) days of the date of entry of this order. *See* Fed. R. App. P. 24(a)(5).

## CONCLUSION

For these reasons, Petitioner's § 2254 Petition is DENIED.  The Court further DENIES

Petitioner leave to proceed in forma pauperis on appeal.

**SO ORDERED**, this 6th day of March, 2019.

s/Thomas L. Parker
THOMAS L. PARKER
UNITED STATES DISTRICT JUDGE